UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>This Document Relates To: | **Case No. 05-MD-1720 (JG) (JO)** |

| | |
|---|---|
| VISA U.S.A. INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, MASTERCARD INCORPORATED, MASTERCARD INTERNATIONAL INCORPORATED, JPMORGAN CHASE & CO., CHASE BANK USA, N.A., CHASE PAYMENTECH SOLUTIONS, LLC, JPMORGAN CHASE BANK, N.A., BANK OF AMERICA, N.A., BANK OF AMERICA CORP., FIA CARD SERVICES, N.A., CITIBANK, N.A., CITIGROUP INC., FIFTH THIRD BANCORP, CAPITAL ONE BANK (USA), N.A., FIRST NATIONAL BANK OF OMAHA, SUNTRUST BANKS, INC., SUNTRUST BANK, TEXAS INDEPENDENT BANCSHARES, INC., WELLS FARGO & COMPANY, and WELLS FARGO BANK, N.A., <br><br>                         Plaintiffs, <br><br>           -against- <br><br>NATIONAL ASSOCIATION OF CONVENIENCE STORES, NATSO, INC., NATIONAL COOPERATIVE GROCERS ASSOCIATION, NATIONAL COMMUNITY PHARMACISTS ASSOCIATION, NATIONAL GROCERS ASSOCIATION, NATIONAL RESTAURANT ASSOCIATION, AFFILIATED FOODS MIDWEST COOPERATIVE, COBORN'S INCORPORATED, D'AGOSTINO SUPERMARKETS, INC., JETRO HOLDINGS, INC., and JETRO CASH & CARRY ENTERPRISES, LLC, <br><br>                       Defendants. | **COMPLAINT FOR DECLARATORY JUDGMENT** |

Visa U.S.A. Inc., Visa Inc., and Visa International Service Association ("Visa International," and together with Visa U.S.A. Inc. and Visa Inc., "Visa") allege as to themselves, MasterCard Incorporated, MasterCard International Incorporated (together with MasterCard Incorporated, "MasterCard") allege as to themselves, and JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., Bank of America, N.A., Bank of America Corp., FIA Card Services, N.A., Citibank, N.A., Citigroup Inc., Capital One Bank (USA), N.A., Fifth Third Bancorp, First National Bank of Omaha, SunTrust Banks, Inc., SunTrust Bank, Texas Independent Bancshares, Inc., Wells Fargo & Company, and Wells Fargo Bank, N.A.  (collectively, the "Bank  Plaintiffs,") allege (together with Visa and MasterCard, "Plaintiffs") for their claims against the National Association of Convenience Stores ("NACS"), NATSO Inc. ("NATSO"), the National Cooperative Grocers Association ("NCGA"), the National Community Pharmacists Association ("NCPA"), the National Grocers Association ("NGA"), the National Restaurant Association ("NRA"), Affiliated Foods Midwest Cooperative, Inc., Coborn's Incorporated ("Coborn's"), D'Agostino Supermarkets, Inc. ("D'Agostino"), Jetro Holdings, Inc., and Jetro Cash & Carry Enterprises, LLC (together, "Jetro") (collectively, the "Defendants") as follows[1]:

## NATURE OF THE ACTION

1.    Plaintiffs bring this action for declaratory judgment pursuant to 28 U.S.C. § 2201 to resolve disputes that have embroiled certain of the parties, and this Court, in antitrust litigation for almost twenty years and that have outlasted two settlements.  On November 27, 2012, this

---

[1] In this Complaint, Visa does not make any allegations as to MasterCard-related conduct and MasterCard does not make any allegations as to Visa-related conduct in support of their respective claims for declaratory judgment.

Court preliminarily approved the second of these settlements (the "Interchange Settlement") in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-md-1720 (E.D.N.Y. Nov. 27, 2012) (Gleeson, J.) (Orenstein, M.J.) (the "*Interchange Fee Litigation*") and provisionally certified two nationwide settlement classes under Federal Rules of Civil Procedure ("FRCP") 23(b)(2) and 23(b)(3).   As of the filing of this complaint, Defendants, each of which was a named plaintiff in the *Interchange Litigation* and participated in the negotiations that led to the Interchange Settlement, have opted out or have made clear their intention to opt out of the 23(b)(3) Settlement Class before the applicable deadline of May 28, 2013.  To expeditiously and finally resolve their disputes with the Defendants, who are among the most vocal opponents of the Interchange Settlement, Plaintiffs here seek a declaration that from January 1, 2004 to November 27, 2012 (the "Damages Period"), the time period for which the Defendants may, as opt-outs, seek damages under the Interchange Settlement, Visa's and MasterCard's conduct in, among other things, continuing to set their respective "default interchange" rates, maintaining their respective "honor all cards" rules, enforcing their respective rules relating to merchants ("Merchant Rules"), and restructuring themselves did not violate federal antitrust law or the antitrust laws of the several States or the District of Columbia.

2.      The Interchange Settlement will provide merchants with what is reportedly the largest private antitrust damages recovery in United States history, and requires Visa and MasterCard to each make significant changes to certain of their respective Merchant Rules.[2]  The Defendants, however, have chosen to opt out of the Rule 23(b)(3) Settlement Class to continue to pursue litigation.

---

[2] The Merchant Rules challenged by Defendants in the *Interchange Litigation* include, *without limitation*, the no-surcharge rule, the honor-all-cards rule as applied to credit cards, the honor-all-cards rule as applied to debit cards, and the no-discrimination rule.

3.      A declaration in Plaintiffs' favor against the Defendants is necessary to prevent the continuation of endless, wasteful litigation between Defendants and Plaintiffs.  In fact, the Interchange Settlement is not the first settlement between Visa and MasterCard and the merchant community.  In 2003, Plaintiffs Visa and MasterCard settled the *In re Visa Check/MasterMoney Antitrust Litigation* (the "*Visa Check Litigation*" or "*Visa Check*"),[3] in exchange for payment of a substantial sum of money.  Despite that settlement, the Interchange Fee Litigation was initiated, thereby subjecting Visa and MasterCard and the Bank Plaintiffs to yet a further class action challenging essentially the same conduct.

4.      In both the *Visa Check Litigation* and the *Interchange Fee Litigation*, merchants who accept Visa- and MasterCard-branded credit and/or debit cards commenced putative plaintiff class actions against Visa, MasterCard, and, with respect to the *Interchange Fee Litigation*, against their respective customer banks, alleging a purported conspiracy to fix interchange rates and to perpetuate Visa's and MasterCard's respective rules that are purportedly anti-competitive.  When, in 2006, MasterCard became a public company through an initial public offering (the "MasterCard IPO"), merchants in the putative plaintiff class for the *Interchange Fee Litigation* brought additional claims alleging that the MasterCard IPO itself violated various antitrust laws.  Merchants in the putative plaintiff class in the *Interchange Fee Litigation* brought similar claims against Visa following its 2008 initial public offering in which Visa became Visa Inc. (the "Visa IPO").

5.      The claims against Visa, MasterCard, and the Bank Plaintiffs in both of these litigations have included claims that they (and Visa's and MasterCard's other bank customers)

---

[3] *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (finally approving settlement), *aff'd Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 (2d Cir. 2005) ("*Visa Check* Order and Final Judgment").

have entered into agreements to establish default interchange rates at artificially high levels, that Visa's and MasterCard's respective Merchant Rules constitute unlawful restraints, and therefore that the merchant discount fees that merchants pay to acquiring banks have been artificially inflated to supra-competitive levels.  The merchant and merchant trade association plaintiffs in the *Interchange Fee Litigation* alleged that Visa's and MasterCard's respective IPOs each perpetuated the same anti-competitive practices that purportedly preceded them.  The Defendants herein, in making clear their intention to bring opt-out actions against Plaintiffs, intend to assert, and have in their objections to the Interchange Settlement and elsewhere suggested they will assert, essentially the same claims with respect to the Damages Period.

6.      Plaintiffs have maintained, and continue to maintain, that Defendants' claims lack merit for several reasons.

(i)      Visa's and MasterCard's respective default interchange rules and the manner in which each of them established default interchange for their respective networks during the Damages Period did not violate the Sherman Act, any other federal antitrust law, or the antitrust laws of the several States or the District of Columbia;

(ii)     Visa Merchant Rules and MasterCard Merchant Rules, each standing alone or viewed together with each network's other such rules and/or default interchange rules, did not violate the Sherman Act, any other federal antitrust law, or the antitrust laws of the several States or the District of Columbia during the Damages Period;

(iii)    The MasterCard IPO did not violate the federal antitrust law or the antitrust laws of the several States or the District of Columbia;

    (iv)     The Visa IPO did not violate the federal antitrust law or the antitrust laws of the several States or the District of Columbia.

    (v)     Merchants are indirect purchasers who cannot recover antitrust damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977);

    (vi)     There was no concerted action among the Bank Plaintiffs, Visa, MasterCard, and other of Visa's and MasterCard's customer banks regarding Visa Merchant Rules, MasterCard Merchant Rules, and/or the Visa and MasterCard respective interchange rules or rates during the Damages Period that could support a claim under the Sherman Act, either before or after the respective MasterCard IPO in May 2006 and Visa IPO in March 2008; and

    (vii)     The *Visa Check* release bars Defendants' claims with respect to the Damages Period.

## JURISDICTION AND VENUE

7.     This Complaint is filed pursuant to 28 U.S.C. § 2201(a) to resolve an actual controversy between the parties. The parties' disputes arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4, 7, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 18, and 26 as well as under various state antitrust and unfair competition laws. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 2201, and 2202, and has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.     An actual and ripe case or controversy exists as between Plaintiffs and Defendants as to all matters alleged herein. Indeed, all of the Defendants have been plaintiffs or proposed class representatives in the *Interchange Fee Litigation*. Defendants have either opted-out of the 23(b)(3) Interchange Settlement class or will have opted-out by the May 28, 2013 deadline.

Defendants have made clear that they intend to pursue their own antitrust damages claims against Plaintiffs with respect to the Damages Period.  Upon information and belief, these commercial parties have relinquished their right to substantial monies from the Interchange Settlement in the hope of recovering larger sums via individual actions.  Under these circumstances, an actual case or controversy exists and Plaintiffs need not wait for Defendants to bring their own actions to seek a declaration from the Court.

9.      This Court has personal jurisdiction over the Defendants either because they conduct continuous and systematic business in New York pursuant to N.Y. C.P.L.R. § 301, or they transact business within New York pursuant to N.Y. C.P.L.R. § 302.  Moreover, all of the Defendants have previously chosen to participate in the *Interchange Fee Litigation* in this District.

10.     Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391 and 15 U.S.C. § 22.  Most, if not all, Plaintiffs transact business and are found in the Eastern District of New York, and Defendants, as noted, have previously chosen to be party to litigation on these issues in this District.  A substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within the Eastern District of New York.

11.     The Eastern District of New York is, in fact, the sole venue with jurisdiction over whether the *Visa Check* settlement bars Defendants' claims.  Judge Gleeson's Order and Final Judgment approving the *Visa Check* settlement releases provides that this Court "retains *exclusive* jurisdiction" over "any suit, action, proceeding or dispute arising out of or relating to [the *Visa Check*] Order and Final Judgment, the Settlement Agreement or the applicability of the Settlement Agreement and exhibits thereto," including, but not limited to, any suit that asserts

the *Visa Check* settlement release "as a defense in whole or in part . . . or otherwise raise[s] [it] as an objection." *Visa Check* Order and Final Judgment ¶ 16 (emphasis added).

12.     Moreover, Visa's settlement with the *Visa Check* plaintiffs provides that the settling parties "irrevocably submit to the exclusive jurisdiction of the United States Court for the Eastern District of New York for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement and exhibits hereto.  All applications to the Court with respect to any aspect of the Settlement should be presented to and determined by United States District Judge John Gleeson."  Visa Settlement Agreement ¶ 39(a).

13.     MasterCard's settlement with the *Visa Check* plaintiffs similarly provides that the settling parties "irrevocably submit to the exclusive jurisdiction of the United States Court for the Eastern District of New York for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement and exhibits hereto.  All applications to the Court with respect to any aspect of the Settlement should be presented to and determined by United States District Judge John Gleeson."  MasterCard Settlement Agreement ¶ 41(a).

14.     Certain of the Defendants herein were members of the settlement class in the *Visa Check* case and are subject to the terms of the *Visa Check* release.  Because Visa and MasterCard are seeking a declaration that Defendants' state and federal antitrust claims are barred by the *Visa Check* settlement release, whether the *Visa Check* settlement now bars those Defendants' claims is squarely within the ambit of its continuing and exclusive jurisdiction provision.

## PARTIES

15.     Visa Inc. is a global payments technology company that enables consumers, businesses, financial institutions, and governments to use electronic payments instead of cash and checks, and has built one of the world's most advanced processing networks.  Visa Inc. is incorporated in the State of Delaware and has its principal place of business in Foster City, California.  Visa U.S.A. Inc. and Visa International are wholly-owned subsidiaries of Visa Inc., incorporated in Delaware, and have their principal places of business in Foster City, California.

16.     MasterCard is a global technology company and payments network that connects merchants, consumers, card issuers, and card acquirers in order to facilitate electronic payments. MasterCard Incorporated is incorporated in the State of Delaware and has its principal place of business in Purchase, New York.  MasterCard International Incorporated is a wholly-owned subsidiary of MasterCard Incorporated and also has its principal place of business in Purchase, New York.

17.     JPMorgan Chase & Co. is a global financial firm providing services in investment banking, commercial banking, financial transaction processing, asset management, and private equity.  It is incorporated in Delaware and has its principal place of business in New York, New York.  Chase Bank USA, N.A. is a wholly-owned subsidiary of JPMorgan Chase & Co., a customer of Visa's and MasterCard's that issues Visa- and MasterCard-branded credit and debit cards.  Chase Bank USA, N.A. is a national banking association and has its principal place of business in Newark, Delaware.  Chase Paymentech Solutions, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Dallas, Texas. JPMorgan Chase Bank, N.A., is a national bank organized under the laws of the United States with its principal place of business in Columbus, Ohio.

18.     Bank of America, N.A. is a national banking association serving individual consumers, small and middle market businesses, corporations and Governments with a range of banking, investing, asset management and other financial and risk management products and services.  It has its principal place of business in Charlotte, North Carolina.  Bank of America Corporation is a Delaware Corporation with its principal place of business in Charlotte, North Carolina, and is the ultimate parent of Bank of America, N.A. FIA Card Services, N.A., is a wholly-owned subsidiary of NB Holdings, Inc., itself a wholly-owned subsidiary of Bank of America Corporation.  FIA Card Services, N.A., is a national banking association with its principal place of business in Wilmington, Delaware.  Bank of America, N.A., and FIA Card Services, N.A., are customers of Visa and MasterCard that issue Visa- and MasterCard-branded credit and debit cards.

19.     Citigroup Inc. is a leading global bank that provides consumers, corporations, governments and institutions with a broad range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, transaction services, and wealth management.  It is incorporated in Delaware and has its principal place of business in New York, New York.  Citibank, N.A. is a national bank located in South Dakota for purposes of the National Bank Act, with its main office in New York, New York and an indirect subsidiary of Citigroup Inc.  Citibank, N.A. is a customer of Visa's and MasterCard's that issues Visa- and MasterCard-branded credit and debit cards.

20.     Capital One Bank (USA), N.A. is a national banking association with its principal place of business in Richmond, Virginia.  Capital One Bank (USA), N.A. is a customer of Visa's and MasterCard's that issues Visa- and MasterCard-branded credit cards.

21.     Fifth Third Bancorp operates as a diversified financial services company in the United States, including commercial banking, branch banking, consumer lending, and investment advisors services.  It is incorporated in Ohio and has its principal place of business in Cincinnati, Ohio.  Fifth Third Bancorp is a customer of Visa's and MasterCard's that, through one or more of its subsidiaries, issues Visa- and MasterCard-branded credit and debit cards.

22.     First National Bank of Omaha engages in consumer, commercial, real estate, and agricultural lending and retail deposit activities in Nebraska, Iowa, Kansas, South Dakota, Colorado, Texas, Wisconsin, Minnesota, and other nearby states.  It is a subsidiary of First National of Nebraska, Inc., which is a Nebraska corporation with its principal place of business in Omaha, Nebraska.  First National Bank of Omaha is a customer of Visa's and MasterCard's that issues Visa- and MasterCard-branded credit and debit cards.

23.     SunTrust Banks, Inc. operates as the holding company for SunTrust Bank, which provides various financial services in the United States, including consumer banking and private wealth management, wholesale banking, and mortgage banking services.  SunTrust Banks, Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia.  SunTrust Banks, Inc. is a customer of Visa's and MasterCard's that issues Visa- and MasterCard-branded credit and debit cards.

24.     Texas Independent Bancshares, Inc. is the holding company for Texas First Bank, which provides various banking products and services to individuals and businesses in Texas.  Texas Independent Bancshares, Inc. is a Texas corporation with its principal place of business in Texas City, Texas.  Texas First Bank is a customer of Visa's that issues Visa-branded credit and debit cards.

25.     Wells Fargo & Company is a financial holding company which is incorporated in

11

Delaware with a principal place of business located in San Francisco, California.  Wells Fargo

Bank, N.A. is a national association and wholly-owned subsidiary of Wells Fargo & Company

with a main office located in Sioux Falls, South Dakota.  Wachovia Bank, N.A. merged into

Wells Fargo Bank, N.A. Wells Fargo Bank, N.A., is, and Wachovia Bank, N.A., was, an issuer

of Visa and MasterCard-branded credit and debit cards.

26.     The National Association of Convenience Stores ("NACS") is a trade association

organized under the laws of Virginia with its principal place of business in Alexandria, Virginia.

Upon information and belief, NACS represents over 2,200 convenience store companies,

operating over 70,000 storefronts in the United States and over 138,000 storefronts worldwide,

including in the Eastern District of New York.  NACS is a named plaintiff in the *Interchange

Fee Litigation* but has refused to sign the settlement agreement.  NACS has made clear that it

will opt-out and sue one or more Plaintiffs through its consistent and unequivocal opposition to

the Interchange Settlement.

27.     NATSO Inc. ("NATSO") is a trade association incorporated under the laws of

Delaware with its headquarters in Alexandria, Virginia.  Upon information and belief, NATSO

represents more than 1,210 travel plazas and truckstops nationwide.  NATSO is a named plaintiff

in the *Interchange Fee Litigation* but has refused to sign the settlement agreement. NATSO has

made clear that it will opt-out and sue one or more Plaintiffs through its consistent and

unequivocal opposition to the Interchange Settlement.

28.     The National Cooperative Grocers Association ("NCGA") is a Minnesota

cooperative with its principal place of business in Iowa City, Iowa, which acts a trade association

for cooperative grocery stores.  Upon information and belief, NCGA represents the interests of

99 non-profit, member-owned cooperatives, which operate 120 storefronts in 31 states, including

a cooperative in the Eastern District of New York.  NCGA is a named plaintiff in the

*Interchange Fee Litigation* but has refused to sign the settlement agreement.  NCGA made clear

that it will opt-out and sue one or more Plaintiffs through its consistent and unequivocal

opposition to the Interchange Settlement.

29.     The National Community Pharmacists Association ("NCPA") is an association

operating under the laws of Virginia with its principal place of business in Alexandria, Virginia.

Upon information and belief, NCPA represents the pharmacist owners, managers, and employees

of nearly 25,000 independent community pharmacists across the United States, including in the

Eastern District of New York.  NCPA is a named plaintiff in the *Interchange Fee Litigation* but

has refused to sign the settlement agreement.  NCPA has made clear that it will opt-out and sue

one or more Plaintiffs through its consistent and unequivocal opposition to the Interchange

Settlement.

30.     The National Grocers Association ("NGA") is an international trade association

organized under the laws of the District of Columbia with its principal place of business in

Arlington, Virginia.  Upon information and belief, NGA members include retail grocery/food

companies and wholesale distributors, some of whom are located in the Eastern District of New

York.  NGA is a named plaintiff in the *Interchange Fee Litigation* but has refused to sign the

settlement agreement.  NGA has made clear that it will opt-out and sue one or more Plaintiffs

through its consistent and unequivocal opposition to the Interchange Settlement.

31.     The National Restaurant Association ("NRA") is a trade association with its

headquarters in the District of Columbia.  Upon information and belief, NRA has state restaurant

association partners in all 50 states.  NRA is a named plaintiff in the *Interchange Fee Litigation*

but has refused to sign the settlement agreement.  NRA has made clear that it will opt-out and

sue one or more Plaintiffs through its consistent and unequivocal opposition to the Interchange Settlement.

32.     Coborn's Incorporated ("Coborn's") is a Minnesota corporation with its principal place of business in St. Cloud, Minnesota.  Upon information and belief, Coborn's operates 90 stores throughout the Midwest and is a member of the National Grocers Association.  Coborn's is a named plaintiff in the *Interchange Fee Litigation* but has refused to sign the settlement agreement.  Coborn's has made clear that it will opt-out and sue one or more Plaintiffs through its consistent and unequivocal opposition to the Interchange Settlement.

33.     D'Agostino Supermarkets, Inc. ("D'Agostino") is a retail grocery chain operating under the laws of New York with its principal place of business in Larchmont, New York.  Upon information and belief, D'Agostino operates 14 grocery stores in the State of New York and is a member of the National Grocers Association.  D'Agostino is a named plaintiff in the *Interchange Fee Litigation* but has refused to sign the settlement agreement.  D'Agostino has made clear that it will opt-out and sue one or more Plaintiffs through its consistent and unequivocal opposition to the Interchange Settlement.

34.     Jetro Cash & Carry Enterprises, Inc., a Delaware corporation with its principal place of business in College Point, New York, is a subsidiary of Jetro Holdings, Inc., a New York corporation with its principal place in College Point, New York (collectively, "Jetro").  Upon information and belief, Jetro operates a total of 93 stores across 28 states under the names "Jetro Cash & Carry" and "Restaurant Depot" and is a cash and carry wholesaler that supplies food and equipment to independent grocery stores and restaurants.  Jetro is a named plaintiff in the *Interchange Fee Litigation* but has refused to sign the settlement agreement.  Jetro has made

clear, through its subsidiary Jetro Holdings, LCC, that it will opt-out and sue one or more Plaintiffs through its consistent and unequivocal opposition to the Interchange Settlement.

35.     Affiliated Foods Midwest Cooperative, Inc. ("Affiliated Foods") is a Nebraska corporation with its principal place of business in Norfolk, Nebraska.  Upon information and belief, Affiliated Foods is a cooperative owned by or serving 850 independent supermarkets in 12 Midwestern states and is a supply warehouse and service provider for its retail grocer members.  Affiliated Foods is a member of the National Grocers Association.  Affiliated Foods is a named plaintiff in the *Interchange Fee Litigation* but has refused to sign the settlement agreement.  Affiliated Foods has made clear that it will opt-out and sue one or more Plaintiffs through its consistent and unequivocal opposition to the Interchange Settlement.

## FACTUAL ALLEGATIONS

I.     **Interchange in the Visa and MasterCard Payment Card Systems**

36.     The Visa and MasterCard networks facilitate the transfer electronically of data and funds among  "merchant acquirers" (described below) and credit card issuing banks ("issuers") when credit and debit cards are used to make purchases.  Visa and MasterCard each accomplish this function by, among other things, prescribing standard data formats and network operating rules to govern the transfer of data and funds among these separate entities.

37.     In both the Visa and the MasterCard networks, payment card transactions involve at least four parties in addition to the network itself:  (i) the cardholder; (ii) the issuer that issued the cardholder's payment card; (iii) the merchant that accepts the cardholder's payment card as a form of payment; and (iv) the merchant acquirer with which the merchant has contracted to process the payment card transaction.  Visa and MasterCard payment card transactions may involve additional parties where the merchant acquirer network customer has contracted with a

third party processor, an independent sales organization ("ISO"), or a customer service provider to provide merchant processing services.

38.     In the United States, there are thousands of issuers that issue Visa- and MasterCard-branded payment cards to cardholders, and hundreds of merchant acquirers—including acquiring customers of Visa and MasterCard, as well as third party processors, ISOs, and customer service providers—that process Visa- and MasterCard-branded payment card transactions for merchants.  Thus, Visa's customer banks and MasterCard's customer banks serve either (or both) of two separate functions in the respective Visa and MasterCard networks.  They issue payment cards to cardholders (and are referred to as "issuers") and/or they acquire and process payment card transactions from merchants (and are referred to as "merchant acquirers").

39.     Typically, when a cardholder presents a Visa- or MasterCard-branded payment card for payment, the merchant must seek authorization for the transaction.  The merchant inputs the cardholder's payment card information into a terminal and transmits that information to its merchant acquirer (or some other third-party intermediary with which the merchant has contracted) for verification and processing, which, in turn, transmits the information through either the Visa network or the MasterCard network for authorization by the issuing bank that issued the cardholder's payment card.  If the issuing bank approves the transaction, it transmits a message through the same network to the merchant acquirer for ultimate transmission to the merchant that the transaction has been authorized.  The merchant then completes the transaction with the cardholder.

40.     Completed transactions are cleared and settled through the Visa network and MasterCard network in a process called "interchange."  The transaction is "settled" when the

issuing bank transfers funds to the applicable network, that network transfers funds to the merchant acquirer, and the merchant acquirer pays the merchant.

41.     Visa and MasterCard each establish their own set of rules, which are designed to ensure that their respective payment card networks function predictably and reliably, for the benefit of all participants.  Thus, for example, Visa and MasterCard have each separately required each acquiring bank to ensure that its merchants accept all credit or debit cards that bear their respective brands regardless of the card's issuer or other card characteristics.  These rules, the "honor-all-cards" rules, have played a key role in the efficient functioning of both payment service networks because they have allowed a wide variety of banks to issue cards under the Visa and MasterCard brands and therefore create card products that the thousands of card-issuing banks could not offer individually.  Additionally, the "honor-all-cards" rules benefit consumers. Consumers avoid the time and effort necessary to determine whether each merchant at which the consumer shops will accept the consumer's particular Visa or MasterCard card for payment at the checkout counter.  Without the "honor-all-cards" rules, merchants could opportunistically pick and choose which Visa and MasterCard credit or debit cards to accept.

42.     Visa's and MasterCard's respective rules also have each required each issuing bank to transfer funds to the merchant acquirer in exchange for a discount established either by bilateral agreement between the issuer and the acquirer or, absent such an agreement, by the applicable network.  (Oct. 2010 Visa Rules,[4] Ch. 7, at 612, Ch. 10, Core Principle 10.3; 2010 MasterCard Rules[5] §§ 3.9.3, 9.4.)  The discount is called the "interchange fee," which, as class plaintiffs in the *Visa Check* case have acknowledged, is "a fee that the bankcard acquiring

---

[4] Visa International Operating Regulations (Oct. 15, 2010) ("Oct. 2010 Visa Rules").

[5] MasterCard Rules (Oct. 29, 2010, updated Dec. 10, 2010) ("2010 MasterCard Rules").

institution pays to the card issuing institution for each retail transaction where the issuer's card is used as a payment device at one of the acquirer's retail store accounts." (*Visa Check* Compl.[6] ¶ 8(o).)

      43.    Visa's and MasterCard's respective default interchange rules each accomplish several pro-competitive purposes, including the following:

      a.   They avoid the need for time-consuming and inefficient individual bilateral agreements between the thousands of bank issuers and hundreds of bank acquirers in the Visa and MasterCard networks. The cost of negotiating these bilateral agreements would drive up the costs of Visa and MasterCard payment card transactions.

      b.   A default set of interchange rules corrects a flaw inherent in an alternative system of bilateral negotiations, which is that network participants would face the possibility of no acceptable agreement being reached among participants—destroying the fundamental assurance of ubiquitous transaction acceptance vital to customers and the network's existence.

      c.   Visa and MasterCard each can and do provide interchange incentives to improve the quality of its network service by adopting new and improved technologies. For example, both networks have used interchange as a strategic tool to strengthen system security, improve the quality of transaction data, and drive other issuer incentives or acquirer incentives to generally improve the quality of their networks.

---

[6] Second Amended Consolidated Class Action Complaint in *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238-JG, 1999 WL 34848247 (E.D.N.Y.) ("*Visa Check* Compl.").

d.  Visa and MasterCard have each independently modified their respective default interchange fees so as to accomplish very rapid migration to electronically authorized transactions, with benefits for all stakeholders—cardholders enjoy faster speed at the point of sale, issuers have more accurate information, and merchants experience more rapid checkouts (and fewer chargebacks).

e.  Visa and MasterCard have each also provided interchange incentives to improve the quality of their respective network services by reducing fraud and chargeback levels.

f.  Visa's and MasterCard's respective default interchange rules have benefited consumers by enabling issuers to improve card features and rewards, and reduce card finance charges and other costs.

g.  Visa's and MasterCard's respective default interchange rules have benefited merchants by providing consumers greater purchasing incentives and thus increasing consumer demand, which increases merchant sales.

h.  Visa and MasterCard each set their own default interchange rates to maximize output of payment card transactions on their respective networks, by increasing consumer usage of cards and increasing card acceptance at merchants.  For example, Visa and MasterCard have each independently set default interchange higher for rewards-based card programs to encourage issuers to fund those programs and encourage consumers to carry and use rewards cards.  That market output—as measured by the dollar sales volume of payment card transactions—has increased in recent years confirms the

pro-competitive nature of Visa's and MasterCard's respective default interchange rules.

    i.   Visa's and MasterCard's respective default interchange rules also provide revenue to bank issuers that enable them to guarantee payment to acquirers for properly authorized Visa and MasterCard (as applicable) card payments.

44.    During the Damages Period, Visa's and MasterCard's respective default interchange rules were necessary, efficient, and pro-competitive.  These rules enabled Visa and MasterCard, respectively, to compete more effectively by, among other things, offering better, more reliable, and higher value services.  Visa's and MasterCard's respective use of their default interchange rules benefited all participants in the four-party network, including merchants.

45.    Notably, the only U.S. case to consider an antitrust challenge to default interchange rules in fact found them to be pro-competitive and lawful after a bench trial. *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d (11th Cir. 1986), *cert. denied*, 479 U.S. 923 (1986).  There, the district court concluded that Visa's default interchange "is of vital import to the day-to-day functioning of the system," eliminates the "prohibitive time and expense of price negotiations at the time of the exchange between the thousands of VISA members," and "promotes efficiency and competitiveness" by addressing the "fundamental economic interdependence between card issuing and merchant signing in the system."  The Eleventh Circuit affirmed, emphasizing that default interchange is "a necessary element in the creation of efficiency creating integration," "without which the system would not function," and "is no broader than required for that purpose."

46.     Merchants do not contract directly with Visa, MasterCard, or with issuers to accept payment cards; merchants contract either with a merchant acquirer, which may be affiliated with the Visa or MasterCard network, or with a third-party processor, ISO, or customer service provider that is not itself affiliated with Visa or MasterCard but that has contracted with a merchant acquirer of one of the networks to perform certain functions.  To handle the merchant's payment card transactions, the merchant acquirer charges the merchant a fee, known as the "merchant discount fee."

47.     Visa and MasterCard each have established Merchant Rules.  During the Damages Period, their respective Merchant Rules, among other things, required merchants to:  (i) impose no surcharge on cardholders (consumers) for using Visa- or MasterCard-branded payment cards (the "no-surcharge" rule); (ii) accept all Visa- or MasterCard-branded credit cards if the merchant accepts any Visa- or MasterCard-branded credit cards (the "honor-all-cards" rule as it applies to credit cards); (iii) accept all Visa- or MasterCard-branded debit cards if the merchant accepts any Visa- or MasterCard-branded debit cards (the "honor-all-cards" rule as it applies to debit cards).  In addition, the Visa Merchant Rules required merchants to refuse to offer to customers that present Visa credit cards discounts that are offered at the point of sale to customers that present competing credit or signature debit cards.  The MasterCard Merchant Rules prohibited merchants from engaging in any acceptance practice that discriminates against or discourages the use of MasterCard-branded cards in favor of any other acceptance brand.

48.     Visa's and MasterCard's respective Merchant Rules were not anticompetitive and were necessary during the Damages Period to facilitate the efficient functioning of each pro-competitive payment services network.  These rules not only protected consumer expectations

and enhanced competition, but benefited merchants as well, who received greater value from accepting Visa and MasterCard cards the more that consumers use those cards.

49.     The "no surcharge" rule did not unreasonably restrain trade during the Damages Period.  By prohibiting surcharges, the "no surcharge" rule has reduced prices for consumers and did not result in antitrust injury during the Damages Period.

50.     The networks' respective "honor-all-cards" rules did not unreasonably restrain trade during the Damages Period.  Indeed, despite claiming in the *In re Visa Check* case that the Visa and MasterCard "honor-all-cards" rules were anticompetitive and unlawful per se because they prevented merchants from rejecting unwanted Visa or MasterCard offline debit card payments, after the case settled and Visa and MasterCard each modified their respective "honor-all-cards" rules to allow merchants to reject offline debit card payments, only a few dozen of the many millions of merchants in the certified class chose to stop accepting Visa or MasterCard offline debit card payments.

51.     Visa's and MasterCard's respective "honor-all-cards" rules played a key role in the efficient functioning of their respective payment service networks during the Damages Period because by allowing a wide variety of banks to issue cards under the Visa brand or MasterCard brand, the "honor-all-cards" rules create card products that the thousands of card-issuing banks could not offer individually.  The "honor-all-cards" rules likewise enhance the efficiency of those products by avoiding the need for thousands of card issuing banks to arrange individually for acceptance at millions of merchants.  As the Eleventh Circuit concluded, "universality of acceptance" is the "key element to a national payment system." *National Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592, 602 (11th Cir. 1986).  In addition, the "honor-all-cards" rules benefit consumers by assuring them that their Visa cards will be accepted at merchants that display the

Visa logo, and that their MasterCard cards will be accepted at merchants that display the

MasterCard logo, regardless of which bank issued the card or what type of card it is. Consumers

also avoid the time and effort necessary to determine whether each merchant at which the

consumer shops will accept the consumer's particular Visa or MasterCard card for payment at

the checkout counter.

52.     Visa's and MasterCard's respective "non-discrimination" rules did not

unreasonably restrain trade during the Damages Period.  A "non-discrimination" rule allows

merchants to provide discounts for customers to pay with cash, checks, PIN debit, and other

forms of payment.  Merchants, however, typically have not offered such discounts.  That

suggests that Visa's and MasterCard's respective "non-discrimination" rules also have not

restrained merchants from providing discounts to customers who pay with the credit cards of

other networks like American Express, and Discover.

53.     Visa's and MasterCard's other respective Merchant Rules, to the extent relevant,

had pro-competitive, not anti-competitive, effects during the Damages Period.

## II.     Merchant Acquirers, Not Merchants, Paid Interchange Fees to the Issuing Banks

54.     During the Damages Period, each of the hundreds of merchant acquirers had the

independence and discretion to set its own merchant discount fees and to decide whether and

how much of the interchange fees to pass on as a component of the merchant discount fee it

charged its merchant customers; merchant acquirers bore the risk of interchange fee fluctuations.

### A.     Merchant Acquirers Paid Interchange Fees to Issuers

55.     An interchange fee is compensation paid by the acquiring bank to the issuing

bank (via the Visa network or the MasterCard network) for the transaction passing through

interchange.

56.     During the Damages Period, Visa and MasterCard each independently maintained their own respective schedules of default Interchange Fees that could be assessed against acquiring customers, depending on the characteristics of the payment card transaction submitted to the Visa network or (if applicable) the MasterCard network for clearance and settlement.  The default schedules have not been identical for each network, either in the parameters of the categories for which different interchange fees apply, or for the amount of the interchange fees applicable for similar categories.  In 2009, for example, Visa had sixty different interchange rate categories and MasterCard had 243 different interchange rate categories.  In general, however, each network classified payment card transactions for interchange purposes according to several categories, including the type of payment card (such as whether the payment card was a debit card, and the level of rewards offered), the mode of processing (such as whether the card was present, whether the transaction information was manually or electronically entered into the system, and the level of security protocols observed), the merchant's line of business, and the size of the merchant's transaction volume.

57.     The default interchange fee paid by the acquiring customer for a particular payment card transaction is determined by the categories applicable to that particular transaction.

**B.      Merchants Paid "Merchant Discount Fees" to Merchant Acquirers**

58.     Merchant acquirers are free to set the merchant discount fee they charge their merchant customers on the basis of their own profit goals and cost demands, and merchant discount fees are accordingly negotiated between each merchant and its merchant acquirer.  (Oct. 2010 Visa Rules, Core Principle 10.2.)  The merchant acquiring business is competitive, and merchant discount fees vary from merchant to merchant as merchant acquirers compete for merchant accounts.  Many merchants contract for payment card processing services with ISOs.

24

ISOs purchase processing services from larger merchant acquirers for resale to their own merchant customers.

59.    Although Visa and MasterCard are not parties to these transactions, many merchants negotiated "bundled" or "blended" rate merchant discount fees during the Damages Period, which means that the merchant paid the same merchant discount fee for each transaction or groups of transactions, notwithstanding variations in the merchant acquirer's cost for those transactions depending, among other things, on the specific interchange fee category or agreement applicable to each transaction.

60.    Upon information and belief, other merchants negotiated "interchange-plus" contracts with merchant acquirers.  These types of arrangements were not all identical.  There were during the Damages Period a number of hybrid types of unbundled pricing, so oftentimes a single term is used amongst industry participants to describe the varying billing and reporting methods.

61.    Upon information and belief, merchants that have entered into interchange-plus contracts typically pay their merchant acquirers an amount equal to the applicable default interchange rates plus the merchant acquirers' fees.  Such contracts do not require merchants to purchase a pre-arranged fixed-quantity of processing services from their merchant acquirers. Indeed, merchants affirmatively encourage their customers to use other payment methods so as to reduce the use of payment cards and quantity of processing services they purchase from their merchant acquirer.[7]

III.    **Flexibility of Client Banks Within the Visa and MasterCard Systems**

---

[7] Upon information and belief, merchant acquirers do not always pass on to merchants the full amount of interchange fees.

A.    **Customer Banks Are Free to Enter into Bilateral Agreements That Alter the Default Interchange Rates**

62.    The Visa interchange rules are default rules that have applied only in those circumstances in which issuing and acquiring customers of Visa have not set their own financial terms for the interchange of Visa transactions.  (May 2005 Visa Rules[8] § 9.5; Nov. 2005 Visa Rules[9] § 9.5; 2006 Visa Rules[10] § 9.5; 2007 Visa Rules[11] § 9.5; 2008 Visa Rules[12] § 9.5; Apr. 2010 Visa Rules,[13] Core Principle 10.3; Oct. 2010 Visa Rules, Core Principle 10.3)  Every Visa issuer has retained the competitive independence to enter into a bilateral agreement with each Visa acquirer to supersede the default interchange rates Visa has established.

63.    The MasterCard interchange rules likewise are default rules that have applied only in those circumstances in which there is no applicable bilateral interchange fee or service fee agreement in place between an issuing customer and an acquiring customer of MasterCard. (2003 MasterCard Rules § 10.1; 2004 MasterCard Rules § 10.1; 2005 MasterCard Rules § 10.1; 2008 MasterCard Rules § 9.4; 2010 MasterCard Rules § 9.4.)  Every MasterCard issuer likewise has retained the competitive freedom to enter into a bilateral agreement with each MasterCard acquirer to supersede the default interchange rates MasterCard has established.

B.    **Customer Banks Have Been Able to Issue Payment Cards of Other Networks, Which Are Realistically Available Alternatives**

64.    Network customers, including the Bank Plaintiffs, have been free to issue payment cards as customers of other networks.

---

[8] Visa U.S.A. Inc. Operating Regulations (May 15, 2005) ("May 2005 Visa Rules").

[9] Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2005) ("Nov. 2005 Visa Rules").

[10] Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2006) ("2006 Visa Rules").

[11] Visa U.S.A. Inc. Operating Regulations (May 15, 2007) ("2007 Visa Rules").

[12] Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2008) ("2008 Visa Rules").

[13] Visa International Operating Regulations (Apr. 1, 2010) ("Apr. 2010 Visa Rules").

65.     During virtually all of the Damages Period, for example, customers of Visa and/or MasterCard were free to issue American Express and Discover Cards, and some customer banks did issue American Express cards.

66.     Merchants, including Defendants herein, accept Visa, MasterCard, American Express, and Discover payment cards as forms of payment.

**C.     Customer Banks Have Been Able to Invest in Other Electronic Payment Systems, Which Are Realistically Available Alternatives**

67.     Customers of Visa and/or MasterCard are free to invest in other electronic payment systems, including, for example, PayPal.  Chase Paymentech Solution has performed merchant acquiring services for merchants using PayPal.

68.     Merchants have accepted PayPal as a form of payment.

**IV.    The Relevant Visa and MasterCard Rules Have Remained Largely Unchanged Since the *Visa Check* Settlement**

69.     Visa first adopted the use of Interchange Fees in the early 1970s.  In May 2005, Visa's default Interchange Rule was amended to provide expressly:  "This section specifies Interchange Reimbursement Fees assessed by Visa to recognize one Member's support of another.  These Interchange Reimbursement Fees apply in all circumstances where Members have not set their own financial terms for the Interchange of Visa Transactions."  (May 2005 Visa Rules § 9.5.)  The May 2005 default interchange fee language remained in the Visa interchange rule until April 2010.  (Nov. 2005 Visa Rules § 9.5; 2006 Visa Rules § 9.5; 2007 Visa Rules § 9.5; 2008 Visa Rules § 9.5.)  In April 2010, Visa redrafted its interchange rules concerning default Interchange Fees to read:  "Interchange reimbursement fees are determined by Visa and provided on Visa's published fee schedule, or may be customized where members have set their own financial terms for the interchange of a Visa transaction or Visa has entered into business agreements to promote acceptance and card usage."  (Apr. 2010 Visa Rules, Core

27

Principle 10.3.)  That language remained unchanged in the October 2010 Visa Rules and has not been materially changed since.  (Oct. 2010 Visa Rules, Core Principle 10.3.)

70.     MasterCard has had a default interchange rule since the 1970s, pursuant to which MasterCard sets default interchange rates that apply to MasterCard transactions, unless there is a bilateral agreement between MasterCard customers.  The October 2003 MasterCard rules provided:  "A member that processes through the Corporation's clearing systems is required to net settle in accordance with the Corporation's settlement Standards.  However, an acquirer and an issuer may, with respect to a particular transaction, agree to settle directly between themselves pursuant to a bilateral agreement."  (2003 MasterCard Rules  § 10.1.)  The February 2008 MasterCard Rules were amended to provide:  "The corporation has the right to establish default interchange fees and default service fees . . . it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee or service fee agreement between two Members in place."  (2008 MasterCard Rules  § 9.4.)  This language remained in place in the 2010 MasterCard Rules and has not been materially changed since.  (2010 MasterCard Rules § 9.4.)

71.     Since 1976, Visa has had a rule requiring merchants that accept Visa-branded payment cards to honor all properly presented Visa-branded payment cards.  As a result of the *Visa Check* settlement, Visa's honor-all-cards rule permits merchants to choose to accept all properly presented Visa-branded debit cards, or all properly presented Visa-branded credit cards, or both.  The 2003 Visa rules provided:  "Effective January 1, 2004, a Merchant that wishes to accept Visa Cards must accept any valid Visa Card in its category of acceptance . . . that a Cardholder properly presents for payment."  (2003 Visa Rules[14] § 5.2.B.3.b.).  This language

---

[14] Visa International Operating Regulations (Nov. 15, 2003) ("2003 Visa Rules").

remained unchanged in the April and October 2010 Visa Rules, except that the 2010 rules refer
to "a U.S. Merchant," rather than "a Merchant."  (Apr. 2010 Visa Rules, Ch. 6, § 5.2B; Oct. 2010
Visa Rules, Ch. 6, § 5.2.B.)  The categories of acceptance to which the rules refer consist of the
Visa Credit and Business Category and the Visa Debit Category.  (Oct. 2010 Visa Rules,
Glossary at 1034.)  There have been no material changes to Visa's honor-all-cards rule since the
October 2010 Visa Rules were implemented.

72.     MasterCard has had an honor-all-cards rule since 1966.  Like the Visa honor-all-
cards rule, MasterCard's honor-all-cards rule changed as a result of the *Visa Check* settlements.
(Class Compl. ¶ 144; MasterCard Settlement Agreement ¶¶ 4, 9.)  The 2004 MasterCard rules
required "merchants that choose to accept Debit MasterCard cards to honor all valid Debit
MasterCard cards without discrimination when properly presented for payment" and "merchants
that choose to accept other MasterCard cards to honor all other MasterCard cards without
discrimination when properly presented for payment."  (2004 MasterCard Rules  § 17.C.1.)  The
relevant language in MasterCard's honor-all-cards rule remained materially unchanged in the
2010 MasterCard rules and continues to be in effect today:  "Merchants that choose to accept
Debit MasterCard cards must honor all valid Debit MasterCard cards without discrimination
when properly presented for payment" and "Merchants that choose to accept Other Cards must
honor all Other Cards without discrimination when properly presented for payment.  (2010
MasterCard Rules, Ch. 15a, § 5.8.1.)  There have been no material changes to MasterCard's
honor-all-cards rule since the 2010 MasterCard Rules were implemented.

73.     Beginning in 1980, Visa prohibited any surcharges to transactions involving Visa-
branded payment cards.  The 2003 Visa rules provided:  "A Merchant must not add: . . . [a]ny
surcharge to Transactions."  (2003 Visa Rules § 5.2.F.)  The April 2010 Visa rules provide:  "A

U.S. Merchant must not:  [a]dd any surcharge to Transactions, except as specified for a Tax

Payment Transaction."  (Apr. 2010 Visa Rules, Ch. 6, § 5.2.F.)  The language in the October

2010 Visa surcharge-related rule remained materially unchanged until January 27, 2013.[15]  (Oct.

2010 Visa Rules, Ch. 6, § 5.2.F.)

74.     Beginning in 1972, MasterCard prohibited the addition of surcharges to

transactions involving MasterCard-branded payment cards.  In 2003, the MasterCard no-

surcharge rule provided:  "A merchant must not directly or indirectly require any MasterCard

cardholder to pay a surcharge or any part of any merchant discount or any contemporaneous

finance charge in connection with a MasterCard card transaction," although the rule permitted a

merchant "to charge a fee . . . if the fee is imposed on all like transactions regardless of the form

of payment used."  (2003 MasterCard Rules § 9.12.2.)  As of its 2010 rules, MasterCard's no-

surcharge rule remained materially unchanged, except that it permitted a merchant to charge a

"convenience" fee "if the fee is imposed on all like transactions regardless of the form of

payment used, or as the Corporation has expressly permitted in writing."  (2010 MasterCard

Rules § 5.11.2.)  The language in the 2010 MasterCard surcharge-related rule remained

materially unchanged until January 27, 2013.[16]

75.     Beginning in 1979, Visa prohibited the establishment of minimum or maximum

transaction amounts as a prerequisite for honoring a Visa-branded payment card.  In 2003, the

Visa rules provided:  "A Merchant must not: . . . [e]stablish a minimum or maximum Transaction

amount as a condition for honoring a Visa Card, Electron Card, or Visa Electron Card."  (2003

Visa Rules § 5.2.F.)  The April 2010 Visa rules similarly provide:  "A U.S. Merchant must not

---

[15] The *Interchange Fee Litigation* settlement modified the no-surcharge rule.

[16] The *Interchange Fee Litigation* settlement also modified MasterCard's no-surcharge rule.

establish a minimum or maximum Transaction amount as a condition for honoring a Visa Card

or Visa Electron Card." (Apr. 2010 Visa Rules, Ch. 6, § 5.2.F)  This language remained

unchanged until it was modified in response to the adoption of a requirement under federal law

that allows merchants to impose $10 minimums on credit card payments.[17]

      76.     Beginning in 1972, MasterCard prohibited the establishment of minimum

transaction amounts as a prerequisite for honoring a MasterCard-branded payment card, and

beginning in the early 1990s, it prohibited the establishment of maximum transaction amounts as

a prerequisite for honoring MasterCard-branded payment cards. In 2003, the MasterCard rules

provided:  "A merchant must not require, or post signs indicating that it requires, a minimum or

maximum transaction amount to accept a valid MasterCard card." (2003 MasterCard Rules §

9.12.3.)  The 2008 MasterCard rules likewise provided: "A Merchant must not require, or

indicate that it requires, a minimum or maximum Transaction amount to accept a valid and

properly presented Card." (2008 MasterCard Rules § 5.9.3.)  The 2010 MasterCard Rules

modified the no minimum purchase rule so that a "Merchant may set a minimum Transaction

amount to accept a Card that provides access to a credit account" so long as "the minimum

Transaction amount does not differentiate between issuers," "the minimum Transaction amount

does not differentiate between MasterCard and another acceptance brand," and "the minimum

Transaction amount does not exceed USD 10 (or any higher amount established by the Federal

Reserve by regulation)." (2010 MasterCard Rules, Chap. 15, § 5.11.3.)  The 2010 MasterCard

Rules modified the no maximum purchase rule to permit merchants to set a maximum

transaction amount when the merchant "is a department, agency or instrumentality of the U.S.

---

[17] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, § 920 (2010).

Government; or is a corporation owned or controlled by the U.S. Government; or is a Merchant whose primary business is reflected by" specified MCCs.  (*Id.*)  That language remained unchanged in the 2010 MasterCard rules and in effect until July 21, 2010 when it was modified in response to the adoption of a requirement under federal law that allows merchants to impose $10 minimums on credit card payments.[18]

77.     Beginning in 1993, Visa permitted merchants to offer discounts for cash and other payment methods at the point of sale, provided that any discount offered when cardholders used certain non-Visa-branded payment cards are also offered to Visa cardholders.  The 2003 Visa rules provided:  "A Merchant may offer a discount as an inducement for a Cardholder to use a means of payment that the Merchant prefers, provided that the discount is:  [c]learly disclosed as a discount from the standard price and [n]on-discriminatory as between a Cardholder who pays with a Visa Card and a cardholder who pays with a 'comparable card.'"  (2003 Visa Rules § 5.2.D.2.a.).  This language remained unchanged in the April and October 2010 Visa rules, except that the 2010 rules refer to "a U.S. Merchant," rather than "a Merchant" (Apr. 2010 Visa Rules, Ch. 6, § 5.2.D.2; Oct. 2010 Visa Rules, Ch. 6, § 5.2.D.2), and was in effect until July 25, 2011.[19]

78.     Beginning in the early 1990s, MasterCard prohibited merchants from engaging in any acceptance practice that discriminates against or discourages the use of MasterCard cards in favor of any other acceptance brand.  The language of MasterCard's non-discrimination rule contained in its 2003 rules – "A merchant must not engage in any acceptance practice that discriminates against or discourages the use of MasterCard cards in favor of any other

---

[18] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, § 920 (2010).

[19] This rule was modified as part of the consent decree Visa entered into with the U.S. Department of Justice to resolve *United States of America, et al v. American Express Company, et al.* (No. CV-10-4496 E.D.N.Y.).

acceptance brand" (2003 MasterCard Rules § 9.12.1) – remained unchanged in the 2010

MasterCard Rules and in effect until July 25, 2011.[20]  (2010 MasterCard Rules § 5.11.1.)

## V.     There Cannot Have Been Any Pre-IPO or Post-IPO Visa Conspiracy During the Damages Period As Banks Did Control or Establish Visa's Rules

79.     At all relevant times, Visa's management has established Visa's default

interchange rates.  At no time did Visa's management consult, let alone enter into any agreement

with any Visa competitor concerning Visa's default interchange rates.

80.     Visa's structure prior to the IPO did not constitute a "structural conspiracy" as

previously alleged by plaintiffs in the *Interchange Fee Litigation*.  The fact that senior executives

of certain banks sat on Visa's board and/or that banks entered into license agreements by which

they agreed to adhere to Visa's rules did not constitute an agreement among those banks, an

agreement between those banks and Visa, or an agreement with MasterCard or any other person

concerning the setting of default interchange rates.

81.     On October 11, 2006, Visa announced its intention to restructure its organization

in order to create a new public global corporation called Visa Inc., the shares of which would be

offered to the public via an IPO and thereafter listed on a major stock exchange.

82.     Pursuant to this restructuring, Visa U.S.A. Inc. and Visa International Service

Association became subsidiaries of Visa Inc.  Visa's customer banks, including the Bank

Plaintiffs, became stockholders in Visa after its initial public offering.

83.     On March 18, 2008, Visa completed its initial public offering through which it

sold more than 400 million shares of voting class A common stock to the general public.

---

[20] This rule was modified as part of the consent decree MasterCard entered into with the U.S. Department of Justice to resolve *United States of America, et al v. American Express Company, et al.* (No. CV-10-4496 E.D.N.Y.).

84.     The three classes of Visa stock have different voting and control rights.  One share of class A stock entitles its holder to one vote.  Class B and C common stock, held by the banks that had previously held common stock as customers of Visa's subsidiaries, cannot vote, except in the case of certain "significant transactions" such as "a proposed consolidation or merger, a decision to exit our core payments business or any other vote required by law." (Amended Visa S-1.[21])

85.     Post-IPO, Visa customer financial institutions may only hold class B and C common stock and are not permitted to hold voting class A common stock.

86.     Only holders of class A common stock may elect directors to the Visa board.

87.     For approximately three years following the Visa IPO, the Visa board was required to have been composed of seventeen directors—Visa's CEO, ten independent directors, and six regional directors affiliated with financial institutions that represent the Visa regions.

88.     Effective January 27, 2011, Visa amended its board composition so that Visa's board now consists solely of ten (10) non-bank directors and no longer includes directors representing the Visa regions.

89.     The IPO eliminated any actual or potential bank control of the Visa network.

90.     Visa's Certificate of Incorporation specifies that banks can vote to "authorize the Corporation to exit its core payments business (*i.e.*, to no longer operate a consumer debit/credit payments business."  (Fifth Amended and Restated Certificate of Incorporation of Visa Inc. at 4.) Banks do not have a right to vote on interchange fee programs or maintaining challenged Visa rules.

---

[21] Visa Inc. Amendment 4 to Visa Form S-1 Registration Statement, (Feb. 25, 2008) ("Amended Visa S-1").

91.     After the Visa IPO, absent approval of Visa's board of directors, no individual entity may own more than 15% of the aggregate shares of the outstanding Visa common stock.

92.     The ownership restrictions help deter any individual third party, including potentially a bank, from taking over Visa.

## VI.     There Cannot Have Been Any Pre-IPO or Post-IPO MasterCard Conspiracy During the Damages Period As Banks Did Not Control or Establish MasterCard's Rules

93.     At all relevant times, MasterCard's has established MasterCard's default interchange rates.  At no time did MasterCard's management consult, let alone enter into any agreement with any MasterCard competitor concerning MasterCard's default interchange rates.

94.     MasterCard's structure prior to the IPO did not constitute a "structural conspiracy" as previously alleged by plaintiffs in the *Interchange Fee Litigation*.  The fact that senior executives of certain banks sat on MasterCard's board and/or that banks entered into license agreements by which they agreed to adhere to MasterCard's rules did not constitute an agreement among those banks, an agreement between those banks and MasterCard, or an agreement with Visa or any other person concerning the setting of default interchange rates.

95.     On May 31, 2006, MasterCard completed its IPO.

96.     Pursuant to the IPO plan, MasterCard was restructured as follows:  MasterCard redeemed member banks' shares with part of the proceeds from the IPO and issued reclassified Class A common shares, representing 100% of the voting rights and 59% of the equity interest in MasterCard's total capitalization.  MasterCard's member banks' remaining shares were reclassified as Class B common shares, representing no voting rights and 41% of the equity interest in MasterCard's total capitalization.

97.     Each member bank also received one share of Class M common stock, representing no equity interest and limited voting rights.  Specifically, Class M shareholders could vote to elect up to three, but no more than 25%, of the members of the board of directors. In addition, Class M shareholders had the right to approve by a majority vote "significant corporate actions" under MasterCard's certificate of incorporation.  Significant corporate actions were limited to the following events: (i) "the sale, lease or exchange of all or substantially all the assets of MasterCard"; (ii) "any merger or consolidation"; (iii) the "issuance of capital stock other than Class A Common Stock, Class B Common Stock, Class M Common Stock"; (iv) a decision "to cease to engage in the business of providing core network authorization, clearing and settlement services for branded payment card transactions"; and (v) any alteration or repeal of the 15% ownership limitation.  Voting rights of the Class M shareholders did not include a right to vote on interchange fee programs or maintaining challenged MasterCard rules.

98.     All shares of the Class M common stock were permanently extinguished on June 1, 2010, when the ownership percentage of Class B shares dropped to less than 15% of MasterCard's outstanding shares.

## VI.     Pre- or Post-IPO, Visa's and MasterCard's Respective Rules Have Not Unreasonably Restrained Trade

99.     Visa's and MasterCard's respective interchange rules did not unreasonably restrain trade during the Damages Period.  Visa's interchange rules were not the result of concerted activity among the Bank Plaintiffs and Visa, or among any other member banks and Visa, or between Visa and MasterCard.  Similarly, MasterCard's interchange rules were not the result of concerted activity among the Bank Plaintiffs and MasterCard, or among other member banks and MasterCard, or between Visa and MasterCard.

100.    In the last two decades and since Visa's and MasterCard's IPOs, payment card transaction volume and the concomitant use of payment card network services have increased substantially.  The aggregate general purpose credit and signature debit card purchase volumes for competitors Visa and MasterCard increased from approximately $222 billion in 1990 to approximately $2.217 trillion in 2008.  In the five years between 2003 and 2008, aggregate general purpose credit and signature debit card purchase volume increased by 67%, from $1.327 trillion in 2003 to $2.217 trillion in 2008.  Similarly, over the period from 2000 to 2008, the annual growth rate for Visa credit card spending was 4.1 percent, which was substantially higher than the annual growth rate of U.S. personal consumption expenditure, after adjusting for inflation, which was 2.6 percent per year over the same period of time.  This rapid growth of Visa spending resulted in Visa's share of U.S. personal consumption expenditures ("PCE") increasing from 7.2 percent to 8.2 percent between 2000 and 2008.   Spending on MasterCard credit cards also increased from $433.70 to $547.30 billion over the period from 2004 to 2008. If anything, Visa's and MasterCard's respective interchange rules have had the pro-competitive effect of increasing the dollar volume of Visa- and MasterCard-branded transactions, rather than reducing it.

## VII.   Visa Has Not Monopolized Any Relevant Market[22]

101.    Visa competes with the network services offered by other networks, including MasterCard's, as well as other payment products.  Visa also competes with sellers of other payment card network services for merchant acceptance.  Merchants also view Visa acceptance as interchangeable with acceptance of other payment products, including other credit and debit

---

[22] The allegations in this section are made by Visa.

cards, cash, and check, as demonstrated by their efforts to steer consumers between the various forms of payment.

102.    Visa operates in a vibrantly competitive environment, which includes credit cards, cash, checks, ACH, PIN-debit cards, signature-debit cards, prepaid/gift cards, and store-branded cards, among other payment forms.  The payments industry is ever-evolving and characterized by shifting shares, efficiency-enhancing innovations in products and processing, and frequent entry of new players.

103.    Visa does not have the power to control prices or exclude competition.  Visa competes vigorously with MasterCard and with other forms of payment, including other payment card networks like American Express and Discover.  Indeed, far from being able to control prices, Visa has repeatedly taken steps so as not to be competitively disadvantaged compared to MasterCard and other payments providers.

104.    Further, Visa does not have the power to restrict output.  As described in greater detail in paragraph 100 above, Visa's output has been increasing.  And, that increase in output did not exclude competition from American Express or Discover, because they too have each increased their output.  From 2004 to 2008, credit and charge card purchase volume increased by approximately 53% for American Express, approximately 44% for Discover, and approximately 35% for Visa.

105.    Moreover, Visa's share of total credit and charge purchase volume has decreased. Visa's share of total credit and charge card purchase volume in 2004 was $610.71 of $1,431.44 billion (approximately 42.7%), in 2005 was $675.27 of $1,583.30 billion (approximately 42.6%), in 2006 was $742.39 of $1,748.79 billion (approximately 42.5%), in 2007 was $807.00 of $1,910.12 billion (approximately 42.2%), and in 2008 was $823.74 of $1,942.40 billion

(approximately 42.4%).  Visa's change in share from approximately 42.7% in 2004 to approximately 42.4% in 2008 is a decrease of approximately 1%.

106.    By virtue of the facts alleged above in paragraphs 101 through 105, Visa has not possessed market power or monopoly power in any properly defined market during the Damages Period.

## VIII.   MasterCard Has Not Monopolized Any Relevant Market[23]

107.    MasterCard competes with the network services offered by other networks, including Visa's, as well as other payment products.  MasterCard also competes with sellers of other payment card network services for merchant acceptance.  Merchants also view MasterCard acceptance as interchangeable with acceptance of other payment products, including other credit and debit cards, cash, and check, as demonstrated by their efforts to steer consumers between the various forms of payment.

108.    MasterCard operates in a vibrantly competitive environment, which includes credit cards, cash, checks, ACH, PIN-debit cards, signature-debit cards, prepaid/gift cards, and store-branded cards, among other payment forms.  The payments industry is ever-evolving and characterized by shifting shares, efficiency-enhancing innovations in products and processing, and frequent entry of new players.

109.    MasterCard does not have the power to control prices or exclude competition. MasterCard competes vigorously with Visa and with other forms of payment, including other payment card networks like American Express and Discover.  Indeed, far from being able to control prices, MasterCard has repeatedly taken steps so as not to be competitively disadvantaged compared to Visa and other payments providers.

---

[23] The allegations in this section are made by MasterCard.

110.    Further, MasterCard does not have the power to restrict output.  As described in greater detail in paragraph 100 above, MasterCard's output has been increasing.  And, that increase in output did not exclude competition from American Express or Discover, because they too each increased their output.  From 2004 to 2008, credit and charge card purchase volume increased by approximately 53% for American Express, approximately 44% for Discover, and approximately 26% for MasterCard.

111.    Moreover, MasterCard's share of total credit and charge purchase volume has decreased.  From 2004 to 2008, MasterCard's share of all credit and charge card purchases was approximately 28–30%.  Specifically, MasterCard's share of total credit and charge card purchase volume in 2004 was $433.70 of $1,431.44 billion (approximately 30.3%), in 2005 was $472.23 of $1,583.30 billion (approximately 29.8%), in 2006 was $508.67 of $1,748.79 billion (approximately 29.1%), in 2007 was $548.10 of $1,910.12 billion (approximately 28.7%), and in 2008 was $547.30 of $1,942.40 billion (approximately 28.2%).  MasterCard's change in share from approximately 30.3% in 2004 to approximately 28.2% in 2008 is a decrease of approximately 7%.

112.    By virtue of the facts alleged above in paragraphs 107 through 111, MasterCard has not possessed market power or monopoly power in any properly defined market during the Damages Period.

IX.    **The Settlements in the *Visa Check* and *Interchange Fee Litigations***

A.    **The Settlement and Release in *Visa Check***

113.    Many of the allegations and arguments made by the class plaintiffs in the *Visa Check Litigation* are identical to the allegations and arguments made by the plaintiffs in the *Interchange Fee Litigation*, including the Defendants.  The merchant class in *Visa Check* alleged

that Visa and MasterCard and their respective customer banks "collectively fix the Visa . . . [and] MasterCard interchange fees." (*Visa Check* Compl. ¶ 45.)  The *Visa Check* class alleged that under Visa and MasterCard rules, "retailers are even prohibited from asking a consumer whether she would not mind using a different payment system," including "far less costly forms of payment."  (*Id.* ¶¶ 74, 87.)  In their summary judgment motion, the *Visa Check* class plaintiffs claimed that "Visa and MC rules specifically prohibited merchants from engaging in any attempts to discourage the holder of any Visa or MC payment card from using that card -- through verbal or other means, or through discounting or surcharging" and that "Visa and MC's rules explicitly prohibit merchants from surcharging Visa/MC transactions." (*Visa Check*, Mem. in Supp. of Pls.' Mot. For Sum. J. at 8, 66 (June 7, 2000).)

114.    Before any judgment was reached, however, in the *Visa Check Litigation*, the parties settled their claims by entering into a settlement agreement, which this Court approved on January 23, 2004.  *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005).

115.    The *Visa Check* settlement: (i) required the payment of more than $3 billion in cash (Visa Settlement Agreement[24] ¶ 3 ($2.025 billion); MasterCard Settlement Agreement[25] ¶ 3 ($1.025 billion)); (ii) lowered, by roughly one-third, debit interchange rates for the period from August 1, 2003, through December 31, 2003, a reduction valued by the *Visa Check* class plaintiffs at tens of billions of dollars (Visa Settlement Agreement ¶ 8; MasterCard Settlement

---

[24] Visa Settlement Agreement, Visa Check, No. 96-CV-5238 (E.D.N.Y. filed Jun. 4, 2003) ("Visa Settlement Agreement").

[25] MasterCard Settlement Agreement, Visa Check, No. 96-CV-5238 (E.D.N.Y. filed Jun. 4, 2003) ("MasterCard Settlement Agreement").

Agreement ¶ 8); (iii) required changes to certain network rules, including the honor-all-cards rules (Visa Settlement Agreement ¶ 4; MasterCard Settlement Agreement ¶ 4), and other merchant acceptance rules (Visa Settlement Agreement ¶ 9; MasterCard Settlement Agreement ¶ 9); and (iv) left in place the default interchange rules, the no-surcharge rules, the non-discrimination rules and a host of other rules allegedly affecting merchant acceptance of Visa and MasterCard payment cards. *Visa Check*, 297 F. Supp. 2d at 508–12.

116.    The settlement agreements in *Visa Check* each contained a release that provided, in full:

> [MasterCard and Visa and their member banks] shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action against the Released parties [MasterCard, Visa and their member banks], whether class, individual, or otherwise in nature, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that any Releasing Party ever had, now has or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 et seq. Each Class Member hereby covenants and agrees that it shall not, hereafter, seek to establish liability against any of the Released Parties based, in whole or in part, upon any of the Released Claims.

(Visa Settlement Agreement ¶ 28; MasterCard Settlement Agreement ¶ 30).

## INTERSTATE COMMERCE

117.    The relevant activities of Visa and MasterCard were within the flow of and had a substantial effect on interstate commerce.

42

## COUNT I
### (Declaratory Judgment for Visa and Bank Plaintiffs – Section 1 of the Sherman Act)

118.   Visa and the Bank Plaintiffs re-allege and fully incorporate herein by reference each and every allegation contained in paragraphs 1 through 117 above.

119.   Defendants are unable to establish that Visa and the Bank Plaintiffs were liable under Section 1 of the Sherman Act based upon Visa's default interchange rules or rates or Merchant Rules.

120.   Visa and the Bank Plaintiffs are therefore entitled to a declaration that:

a)   Visa's default interchange rules and the manner in which default interchange was established by Visa did not violate Section 1 of the Sherman Act;

b)   Visa Merchant Rules, each standing alone or viewed together with other such rules and/or default interchange rules, did not violate Section 1 of the Sherman Act; and,

c)   There was no concerted action among (i) any Visa member banks, (ii) the Bank Plaintiffs and Visa, (iii) any other member banks and Visa, or (iv) Visa and MasterCard regarding Visa Merchant Rules and/or interchange rules or rates that could support a claim under Section 1 of the Sherman Act.

121.   In addition to the aforesaid declaration, Visa and the Bank Plaintiffs seek such additional and further relief as the Court deems appropriate.

## COUNT II:
### (Declaratory Judgment for MasterCard and Bank Plaintiffs – Section 1 of the Sherman Act)

122.   MasterCard and the Bank Plaintiffs re-allege and fully incorporate herein by

43

reference each and every allegation contained in paragraphs 1 through 117 above.

123.    Defendants are unable to establish that MasterCard and the Bank Plaintiffs were liable under Section 1 of the Sherman Act based upon MasterCard's default interchange rules or rates or Merchant Rules.

124.    MasterCard and the Bank Plaintiffs are therefore entitled to a declaration that:

a)      MasterCard's default interchange rules and the manner in which default interchange was established by MasterCard did not violate Section 1 of the Sherman Act;

b)      MasterCard's Merchant Rules, each standing alone or viewed together with other such rules and/or default interchange rules, did not violate Section 1 of the Sherman Act; and,

c)      There was no concerted action among (i) any MasterCard member banks, (ii) the Bank Plaintiffs and MasterCard, (iii) any other member banks and MasterCard, or (iv) Visa and MasterCard regarding MasterCard Merchant Rules and/or interchange rules or rates that could support a claim under Section 1 of the Sherman Act.

125.    In addition to the aforesaid declaration, MasterCard and the Bank Plaintiffs seek such additional and further relief as the Court deems appropriate.

## COUNT III:
### (Declaratory Judgment for Visa Regarding Visa's IPO)

126.    Visa re-alleges and incorporates by reference herein each of the allegations set forth in paragraphs 1 through 117 above.

127.    Defendants are unable to establish that Visa's IPO violated any federal or state antitrust law or caused any antitrust injury during the Damages Period.

128.     Visa is therefore entitled to a declaration that its IPO did not violate any federal or state antitrust law or cause any antitrust injury during the Damages Period.

129.     In addition to the aforesaid declaration, Visa seeks such additional and further relief as the Court deems appropriate.

## COUNT IV:
### (Declaratory Judgment for MasterCard Regarding MasterCard's IPO)

130.     MasterCard re-alleges and incorporates by reference herein each of the allegations set forth in paragraphs 1 through 117 above.

131.     Defendants are unable to establish that MasterCard's IPO violated any federal or state antitrust law or caused any antitrust injury during the Damages Period.

132.     MasterCard is therefore entitled to a declaration that its IPO did not violate any federal or state antitrust law or cause any antitrust injury during the Damages Period.

133.     In addition to the aforesaid declaration, MasterCard seeks such additional and further relief as the Court deems appropriate.

## COUNT V:
### (Declaratory Judgment for Visa – Section 2 of the Sherman Act)

134.     Visa re-alleges and incorporates by reference herein each of the allegations set forth in paragraphs 1 through 117 above.

135.     Defendants are unable to establish that Visa was liable under Section 2 of the Sherman Act.

136.     Visa is therefore entitled to a declaration that it did not violate Section 2 of the Sherman Act.

137.     In addition to the foresaid declaration, Visa seeks such other and further relief as to the Court deems appropriate.

## COUNT VI:
### (Declaratory Judgment for MasterCard – Section 2 of the Sherman Act)

138.   MasterCard re-alleges and incorporates by reference herein each of the allegations set forth in paragraphs 1 through 117 above.

139.   Defendants are unable to establish that MasterCard was liable under Section 2 of the Sherman Act.

140.   MasterCard is therefore entitled to a declaration that it did not violate Section 2 of the Sherman Act.

141.   In addition to the foresaid declaration, MasterCard seeks such other and further relief as to the Court deems appropriate.

## COUNT VII:
### (Declaratory Judgment for Visa and Bank Plaintiffs – *Illinois Brick*)

142.   Visa and the Bank Plaintiffs re-allege and fully incorporate herein by reference each and every allegation contained in paragraphs 1 through 117 above.

143.   Defendants were indirect purchasers who could not recover damages under the federal antitrust laws pursuant to *Illinois Brick*.

144.   Visa and the Bank Plaintiffs are therefore entitled to a declaration that Defendants were indirect purchasers who could not recover damages under the federal antitrust laws pursuant to *Illinois Brick*.

145.   In addition to the aforesaid declaration, Visa and the Bank Plaintiffs seek such additional and further relief as the Court deems appropriate.

## COUNT VIII:
### (Declaratory Judgment for MasterCard and Bank Plaintiffs – *Illinois Brick*)

146.   MasterCard and the Bank Plaintiffs re-allege and fully incorporate herein by reference each and every allegation contained in paragraphs 1 through 117 above.

147.    Defendants were indirect purchasers who could not recover damages under the federal antitrust laws pursuant to *Illinois Brick*.

148.    MasterCard and the Bank Plaintiffs are therefore entitled to a declaration that Defendants were indirect purchasers who could recover antitrust damages under *Illinois Brick*.

149.    In addition to the aforesaid declaration, MasterCard and the Bank Plaintiffs seek such additional and further relief as the Court deems appropriate.

<u>**COUNT IX:**</u>
**(Declaratory Judgment for Visa and Bank Plaintiffs – *Visa Check* Release)**

150.    Visa and the Bank Plaintiffs re-allege and fully incorporate herein by reference each and every allegation contained in paragraphs 1 through 117 above.

151.    The *Visa Check* release barred Defendants' claims.

152.    Visa and the Bank Plaintiffs are therefore entitled to a declaration that the *Visa Check* release bars any claims Defendants might assert for the Damages Period.

153.    In addition to the aforesaid declaration, Visa and the Bank Plaintiffs seek such additional and further relief as the Court deems appropriate.

<u>**COUNT X:**</u>
**(Declaratory Judgment for MasterCard and Bank Plaintiffs – *Visa Check* Release)**

154.    MasterCard and the Bank Plaintiffs re-allege and fully incorporate herein by reference each and every allegation contained in paragraphs 1 through 117 above.

155.    The *Visa Check* release barred Defendants' claims.

156.    MasterCard and the Bank Plaintiffs are therefore entitled to a declaration that the *Visa Check* release bars any claims Defendants might assert for the Damages Period.

157.    In addition to the aforesaid declaration, MasterCard and the Bank Plaintiffs seek such additional and further relief as the Court deems appropriate.

**COUNT XI:**
**(Declaratory Judgment for Visa and Bank Plaintiffs – State Antitrust Claims)**

158.    Visa and the Bank Plaintiffs re-allege and fully incorporate herein by reference each and every allegation contained in paragraphs 1 through 117 above.

159.    Defendants are unable to establish that Visa and the Bank Plaintiffs were liable under the laws of the several States or the District of Columbia based upon Visa's default interchange rate and Merchant Rules or the Visa IPO.

160.    Visa and the Bank Plaintiffs are therefore entitled to a declaration that they were not liable to Defendants under the laws of the several States or the District of Columbia based upon Visa's default interchange rules or rates, Merchant Rules, or the Visa IPO.

161.    In addition to the aforesaid declaration, Visa and the Bank Plaintiffs seek such additional and further relief as the Court deems appropriate.

**COUNT XII:**
**(Declaratory Judgment for MasterCard and Bank Plaintiffs – State Antitrust Claims)**

162.    MasterCard and the Bank Plaintiffs re-allege and fully incorporate herein by reference each and every allegation contained in paragraphs 1 through 117 above.

163.    Defendants are unable to establish that MasterCard and the Bank Plaintiffs were liable under the laws of the several States or the District of Columbia based upon MasterCard's default interchange rules or rates, Merchant Rules, or the MasterCard IPO.

164.    MasterCard and the Bank Plaintiffs are therefore entitled to a declaration that they were not liable to Defendants under the laws of the several States or the District of Columbia based upon MasterCard's default interchange rate and Merchant Rules or the MasterCard IPO.

165.    In addition to the aforesaid declaration, MasterCard and the Bank Plaintiffs seek such additional and further relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in its favor and against the Defendants on Counts I through XII granting:

(a)     A declaration pursuant to 28 U.S.C. § 2201 that Plaintiffs were not liable under federal antitrust law or the law of the several States and the District of Columbia based upon Visa's and MasterCard's respective default interchange rules or rates, Merchant Rules, or IPOs, respectively;

(b)     Costs of this suit; and

(c)     Any such further relief as justice and equity may require.

DATED:    New York, New York                Respectfully submitted,
          May 24, 2013

                                            **HOLWELL SHUSTER & GOLDBERG LLP**

                                            By: /s/ Michael S. Shuster

                                               Richard J. Holwell
                                               Michael S. Shuster
                                               Demian A. Ordway
                                               Zachary A. Kerner
                                               125 Broad Street, 39th Floor
                                               New York, NY 10004
                                               (646) 837-5151
                                               mshuster@hsgllp.com

                                            **ARNOLD & PORTER LLP**

                                               Robert C. Mason
                                               399 Park Avenue
                                               New York, NY   10022-4690
                                               (212) 715-1000
                                               robert.mason@aporter.com

49

Robert J. Vizas
Three Embarcadero Center, Seventh Floor
San Francisco, CA   94111-4024

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, NW
Washington, DC   20004-1206

*Attorneys for Plaintiffs Visa Inc., Visa U.S.A.*
*Inc., andVisa International Service Association*


**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Keila R. Ravelo
    Keila D. Ravelo
    Wesley R. Powell
    Matthew Freimuth
    787 Seventh Avenue
    New York, NY   10019-6099
    (212) 728-8000
    kravelo@willkie.com

**PAUL, WEISS, RIFKIND, WHARTON &**
**    GARRISON LLP**

Kenneth A. Gallo
Joseph J. Simons
2001 K Street, NW
Washington, DC   20006-1047

Andrew C. Finch
Gary R. Carney
1285 Avenue of the Americas
New York, NY   10019-6064

*Attorneys for Plaintiffs MasterCard*
*Incorporated and MasterCard International*
*Incorporated*

**MORRISON & FOERSTER LLP**

By:  /s/ Mark P. Ladner
     Mark P. Ladner
     Michael B. Miller
     1290 Avenue of the Americas
     New York, NY   10104-0050
     (212) 468-8000
     mladner@mofo.com

*Attorneys for Plaintiffs Bank of America,
N.A., FIA Card Services, N.A., and Bank of
America Corporation*

**O'MELVENY & MYERS LLP**

By:  /s/ Andrew J. Frackman
     Andrew J. Frackman
     Abby F. Rudzin
     Times Square Tower
     7 Times Square
     New York, NY   10036
     (212) 326-2000
     afrackman@omm.com

*Attorneys for Plaintiff Capital One Bank (USA),
N.A.*

**SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP**

By:  /s/ Peter E. Greene
     Peter E. Greene
     Peter S. Julian
     Four Times Square
     New York, NY   10036
     (212) 735-3000
     peter.greene @skadden.com

*Attorneys for Plaintiffs JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., Chase Bank*
*USA, N.A., Chase Paymentech Solutions, LLC*

**SIDLEY AUSTIN LLP**

By:  /s/ David F. Graham
     David F. Graham
     Eric H. Grush
     One South Dearborn Street
     Chicago, IL   60603
     (312) 853-7000
     dgraham@sidley.com

     Benjamin R. Nagin
     Eamon Joyce
     787 Seventh Avenue
     New York, NY   10019

*Attorneys for Plaintiffs Citibank, N.A.and*
*Citigroup Inc.*

**KEATING MUETHING & KLEKAMP PLL**

By:  /s/ Richard L. Creighton
     Richard L. Creighton
     Joseph M. Callow, Jr.
     Drew M. Hicks
     One East Fourth Street, Suite 1400
     Cincinnati, OH   45202
     (513) 579-6400
     rcreighton@kmklaw.com

*Attorneys for Plaintiff Fifth Third Bancorp*

**KUTAK ROCK LLP**

By:  /s/ David S. Lesser
     David S. Lesser
     7 World Trade Center
     250 Greenwich Street
     New York, NY   10007
     (212) 230-8851
     david.lesser@wilmerhale.com

**PULLMAN & COMLEY, LLC**

By:  /s/ Jonathan B. Orleans
     Jonathan B. Orleans
     Adam S. Mocciolo
     850 Main Street
     Bridgeport, CT   06601-7006
     (203) 330-2000
     jborleans@pullcom.com

*Attorneys for Plaintiff Texas Independent Bancshares, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**

By:  /s/ Robert P. LoBue
     Robert P. LoBue
     William F. Cavanaugh
     1133 Avenue of the Americas
     New York, NY   10036
     (212) 336-2000
     rlobue@pbwt.com

*Attorneys for Plaintiffs Wells Fargo & Company and for Wells Fargo Bank, N.A.*

**ALSTON & BIRD LLP**

By:  /s/ Teresa T. Bonder
     Teresa T. Bonder
     Valarie C. Williams
     Kara F. Kennedy
     1201 W. Peachtree Street, NW
     Atlanta, GA   30309
     (404) 881-7000
     teresa.bonder@alston.com

*Attorneys for Plaintiffs SunTrust Banks, Inc.and SunTrust Bank*